IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JEREMY A. POWELL, et al.,

                Plaintiffs,

v.                                CIVIL ACTION NO.  2:13-cv-32179

THE HUNTINGTON NATIONAL BANK,

                Defendant.

MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Huntington National Bank's ("Huntington") Motion for Summary Judgment.  (ECF No. 117.)  For the reasons provided below, the Court **GRANTS** the motion.[1]

*I.  BACKGROUND*

Plaintiffs Jeremy A. Powell and Tina M. Powell bring this action against Huntington, alleging causes of action arising out of a home loan that Plaintiffs acquired through the bank.  (*See* ECF No. 1-1 at 4, ¶ 1.)  Plaintiffs filed their Complaint in the Circuit Court of Kanawha County, West Virginia, on October 15, 2013.  (*Id.*)  The Complaint alleges that this is a class action pursuant to West Virginia Rule of Civil Procedure 23 and that the matter is brought "on his [sic] own behalf and on behalf of a class of West Virginia consumers who have had unlawful late fees charged to their home loan accounts."  (*Id.* at 5–6, ¶¶ 12–16.)  According to the Complaint, Huntington

---

[1] The Court notes that Plaintiffs' Motion to Set Aside and Objections to Magistrate Judge's Order Dated October 30, 2014, is also pending.  (ECF No. 84.)  Because the current order disposes of this case, the motion to set aside is **DENIED AS MOOT**.  Accordingly, Huntington's Request for Hearing on the Motion, (ECF No. 88), also is **DENIED AS MOOT**.

illegally assessed late fees in violation of the terms of Plaintiffs' mortgage loan contract and in violation of the West Virginia Consumer Credit and Protection Act ("WVCCPA"), (*see id.* at 7–8, ¶¶ 17–22), and misrepresented the amount of a claim in violation of the WVCCPA.  (*See id.* at 8, ¶¶ 23–24.)   It is not in dispute that Huntington charged Plaintiffs multiple late fees.  (*See id.* at 5, ¶¶ 8–11; ECF No. 118 at 4–5.)

Plaintiffs allege that Huntington "agreed to only charge Plaintiffs one late fee for each missed payment."  (ECF No. 1-1 at 5, ¶ 7.)  However, Plaintiffs state that "Huntington regularly assessed late fees for months in which a payment was timely made within the period stated in Plaintiffs' Note."  (*Id.* ¶ 8.)  Plaintiffs assert as an example that while they "made a full payment on October 8, 2012, within the contractual period set forth in [their] Note, Huntington assessed Plaintiffs a late fee on October 17, 2012," and that "on November 5, 2012, Plaintiffs made another full payment, which included a $15.00 late fee . . . Nevertheless, on November 19, 2012, Huntington assessed Plaintiffs another late fee."  (*Id.* ¶¶ 9–10.)  Plaintiffs contend that "Huntington regularly and systematically assesse[d] late fees in this manner."  (*Id.* ¶ 11.)

On December 13, 2013, Huntington timely removed the state case to this Court pursuant to 28 U.S.C. § 1441, and Huntington's answer to the Complaint was filed the same day.  (ECF Nos. 1, 3.)    This Court found that it has diversity jurisdiction over this case in its previous memorandum opinion issued September 26, 2014.  (*See* ECF No. 57 at 12–13.)  Huntington filed this Motion for Summary Judgment and memorandum in support of its motion on April 25, 2016. (ECF Nos. 117, 118.)  In accordance with this Court's order amending the schedule on July 13, 2016, (ECF No. 129), Plaintiffs responded to Huntington's motion on August 3, 2016, (ECF No. 139), and Huntington filed a reply memorandum in support of its motion on August 24, 2016. (ECF No. 144.)  The motion is fully briefed and ripe for adjudication.

## II.  STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If there exist factual issues that properly can be resolved only by a trier of fact because they may reasonably be determined in favor of either party, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).  *See also Pulliam Inv. Co., Inc. v. Cameo Props*., 810 F.2d 1282, 1286 (4th Cir. 1987).  The moving party bears the burden of showing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322–23.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his case and does not make, after adequate time for discovery, a showing sufficient to establish that element.  *Id.*

When determining whether there is an issue for trial, the Court must view all evidence in the light most favorable to the nonmoving party.  *Mellen v. Brunting*, 327 F.3d 355, 363 (4th Cir. 2003).  "[T]he issue of material fact required by Rule 56[a] to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Anderson*, 477 U.S. at 248–49.  The nonmoving party may not rest on the pleadings alone and must show that specific material facts exist by offering more than a mere "scintilla of evidence" in support of his or her position.  *Id.* at 252.  Summary judgment is also appropriate when the inquiry involves a pure question of law.  *Taft v. Vines*, 70 F.3d 304, 316 (4th Cir. 1995), *vacated en banc on different grounds*, 83 F.3d 681 (4th Cir. 1996).

*III.  DISCUSSION*

Huntington moves for summary judgment, arguing that for the alleged causes of action to be viable, "Plaintiffs must prove that Huntington was required, but failed, to apply Plaintiffs' October 2012 payment 'first to current installments, then to delinquent installments.'"  (ECF No. 118 at 7 (quoting W. Va. Code § 46A-3-112(3)).  It is not disputed that Huntington is a national banking association organized under the National Bank Act ("NBA").  (*See* ECF No. 1-1 at 5, ¶ 3; ECF No. 3 at 1, ¶ 3.)  Huntington claims that Plaintiffs' claims fail as a matter of law because the state law provision at issue, section 46A-3-112(3) of the WVCCPA, is preempted by the NBA. (*See* ECF No. 118 at 8.)  Huntington attempts to prove this by arguing, first, that NBA § 85 preempts Plaintiffs' challenge to the late fees, (*see id.* at 8–17), and, second, that the NBA and regulations issued by the Office of the Comptroller of the Currency ("OCC") preempt Plaintiffs' challenge to the way in which Huntington posts payments to borrowers' accounts.  Each of these two counts is addressed below.

The United States Constitution's Supremacy Clause makes federal law "the supreme law of the land . . . anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const. art. VI, cl. 2.  "As a result, federal statutes and regulations properly enacted and promulgated can nullify conflicting state or local actions."  *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005).  Such state or local laws may be preempted under the Supremacy Clause in three ways—by express preemption, field preemption, or conflict preemption.  *See Watkins v. Wells Fargo Home Mortg.*, 631 F. Supp. 2d 776, 783 (S.D. W.Va. 2008) (citing *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (internal citation omitted)).  Express preemption occurs when "Congress expressly declares its intent to preempt state law."  *Pinney v. Nokia, Inc.*, 402 F.3d 430, 453 (4th Cir. 2005).  Field preemption takes place when "Congress

'occupies the field' regulating so pervasively that there is no room left for the states to supplement federal law." *Watkins*, 631 F. Supp. 2d at 783 (citing *Anderson*, 508 F.3d at 191 (internal citation omitted)).  Lastly, conflict preemption "occurs when state law actually conflicts with federal law." *Anderson*, 508 F.3d at 191.

The only type of preemption at issue in this case is conflict preemption.  Express preemption and field preemption do not apply to the activities of national banks because the language of the NBA does not provide for express preemption, and the United States Supreme Court, the relevant federal regulations, and the OCC itself, "envision some role, even if a limited one, for state regulation of national banks." *See, e.g.*, *Watkins*, 631 F. Supp. 2d at 784.  "Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).  While a conflict between state and federal law does not need to be direct, a finding that two laws directly conflict indicates the need to engage in a conflict preemption analysis.  *See City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002).

This Court determined in its memorandum opinion issued September 26, 2014, that Plaintiffs' claims were not completely preempted by the NBA.  (*See* ECF No. 57 at 5–12.) Huntington argues in its motion that while the Court found Plaintiffs' claims not to be completely preempted for purposes of finding a basis for removal, the Court may still find that the same claims are not cognizable due to ordinary preemption.  (*See* ECF No. 118 at 8–17.)  As a matter of law, Huntington is correct.  The linguistic resemblance between complete preemption and ordinary or conflict preemption does not signify a similarly close jurisprudential relationship.  *See Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005); *Richards v. Appalachian Power Co.*, 836 F. Supp. 2d

436, 440 (S.D. W.Va. 2011).  The complete preemption doctrine and ordinary preemption defense are "starkly different."  *See King v. Homeside Lending, Inc.*, No. 2:03-cv-2134, 2007 WL 1009383, at *6 (S.D. W.Va. Mar. 30, 2007) (citations omitted).  "Complete preemption is a 'jurisdictional doctrine,' while ordinary preemption simply declares the primacy of federal law . . . ." *Id.* (citing *Sonoco Prods. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370–71 (4th Cir. 2003)).  *See also C.S. v. United Bank, Inc.*, No. 2:08-cv-921, 2009 WL 777643, at *5 (S.D. W.Va. Mar. 20, 2009).  Ordinary preemption is a "defense to the allegations," *see Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987), and is more easily determinable than complete preemption, especially given that complete preemption must be concluded on the face of the pleadings without the benefit of supporting evidence.  *See Lontz*, 413 F.3d at 441 ("[T]he Supreme Court has made clear that it is 'reluctant' to find complete preemption . . . The Court has, in fact, found complete preemption in only three statutes." (citations omitted)); *see also Smithson v. Smithson*, No. 1:15-cv-0583, 2015 WL 2359569, at *3 (S.D. W.Va. May 15, 2015) ("The presumption, in other words, is against finding complete preemption." (citation omitted)).  "[D]efendants seeking removal under the doctrine of complete preemption bear a significant burden . . . And as we must construe removal strictly, reasonable doubts must be resolved against the complete preemption basis for it."  *Lontz*, 413 F.3d at 441 (citing *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005)).  Several district court opinions support the notion that "the [NBA] does not completely preempt all claims concerning national banks[,] but rather, preemption is limited to certain types of claims such as usury . . . ."  *See, e.g.*, *Booth v. Old Nat'l Bank*, 900 F. Supp. 836, 841 (N.D. W.Va. 1995).  Thus, despite this Court's determination that Plaintiffs' claims are not completely preempted by NBA §§ 85, 86, the possibility that those claims are ordinarily preempted still remains.

6

### A. Preemption by National Bank Act § 85

Congress enacted the NBA "to facilitate . . . a national banking system." *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 315 (1978) (internal quotation omitted). Section 85 of the NBA states, in relevant part, that "[a]ny association may . . . charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank is located . . . ." 12 U.S.C. § 85. The WVCCPA, at section 46A-3-112, promulgates the following:

> (3) No delinquency charge may be collected on an installment which is paid in full within ten days after its scheduled or deferred installment due date, even though an earlier maturing installment or a delinquency or deferral charge on an earlier installment may not have been paid in full. For purposes of this subsection, payments shall be applied first to current installments, then to delinquent installments and then to delinquency and other charges.

W. Va. Code § 46A-3-112(3). The Supreme Court held in *Smiley v. Citibank (S.D.), N.A.* that the word "interest" within § 85 included late-payment fees as provided for by OCC regulations. *See* 517 U.S. 735, 745–47 (1996); *see also* 12 C.F.R. § 7.4001 ("The term 'interest' as used in 12 U.S.C. [§] 85 includes . . . late fees . . . ."). The Court concluded that the OCC regulation defining "interest" is entitled to deference and is a reasonable interpretation of § 85 as required by the Court's previous decision in *Chevron*. *See* 517 U.S. at 741, 744–45; *see also Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–845 (1984). Thus, a state law that conflicts with a national bank's decision regarding what late fee rate to charge—given that the rate is acceptable under the laws of the state where the bank is located—will be preempted.

Huntington argues that § 85 "authorizes [it] to charge a late fee in any month when the borrowers remained delinquent on their mortgage repayment obligations." (ECF No. 118 at 8.) Huntington relies on the Ohio Consumer Sales Practices Act in support of the proposition that "there are no restrictions on a bank's power to charge a borrower a late fee when the borrower remains behind on his or her mortgage repayment obligations." (*See id.* at 9.) If a borrower

remains behind on loan payments, Huntington states that it has the ability to determine "how a payment should be applied to an outstanding mortgage account balance" according to its internal "posting policy."[2]  (*See* ECF No. 117-1 at 10, ¶¶ 38–39 (McKee Aff.).)  Huntington continues to argue that because Ohio law does not restrict in any way its ability to charge late fees, the WVCCPA provision at issue cannot stand because it "attempt[s] to ban Huntington from charging late fees." (ECF No. 118 at 10.  *See* ECF No. 117-1 at 4, ¶ 9 ("[I]n servicing the Powells' mortgage, Huntington applied federal law and looked to the laws of the state of Ohio . . . to determine what interest charges (including late fees) could permissibly be assessed to the Powells under Section 85 and the Powells' Note and their Deed of Trust.").)  *See also* W. Va. Code § 46A-3-112(3).  It cites the Supreme Court's decisions in *Smiley* and *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299 (1978), as well as the Fourth Circuit's decision in *Discover Bank v. Vaden*, 489 F.3d 594 (4th Cir. 2007), to support the proposition that § 85 preempts the WVCCPA provision seeking to control the assessment of certain late fees.  (*See* ECF No. 118 at 10–14.)  While Huntington recognizes Plaintiffs' claim that this case is about incorrectly charged late fees as opposed to the amount or rate of the fees, its memorandum alleges that "[§] 85 authorizes national banks to export the *entire* law of its home state relating to interest charges,

---

[2] Huntington justifies its "posting policy" by arguing the following:

> Charging late fees for customers who fail to timely repay their loans compensates Huntington for the risk that a loan will not be timely repaid.  In addition, imposing late fees for each month a customer remains behind on their loan repayment obligations deters customers from making multiple and repeated late payments—or even from skipping a monthly payment entirely . . . Huntington's only remedy under the loan agreements for a borrower who is serially delinquent would be to exercise its right to demand immediate payment of the principal loan balance and foreclose on the property to collect that loan balance.

(ECF No. 117-1 at 11, ¶ 42 (McKee Aff.).)

> The Court also notes that Huntington's "posting policy" is not a written policy, but rather it is Huntington's "procedure . . . to assess [a] late charge if the payment is not received prior to the grace period being up . . . ." (*See* ECF No. 117-2 at 7:15–19 (McKee Dep.).)  The procedure's implementation varies between customers, however, as Huntington has no "specific practices as it relates to late charges in West Virginia." (*See id.* at 6:7–9, 8:8–10.)

not just the portions of that law that relate to the amount of interest permitted." (*Id.* at 14 (citations omitted) (emphasis in original).)

Plaintiffs object to an interpretation of § 85 that allows Huntington to "'export' *all* of their 'home state's laws regarding the permissibility of interest charges into other states.'" (ECF No. 139 at 12 (quoting ECF No. 118 at 8) (emphasis in original).) They argue that § 85 is explicit in allowing national banks to export only laws addressing interest *rates*. (*See id.*) Plaintiffs cite this Court's September 26, 2014, opinion and reiterate that Plaintiffs "do not challenge interest rates," and because the claims are not usury claims, they are not preempted by § 85. (*See id.* at 12–13 (citing ECF No. 57 at 8–9).) Plaintiffs also refute Huntington's use of *Smiley*, *Marquette*, and *Vaden* as support for the argument that § 85 preempts any and all state laws regarding the charge of interest. (*See id.* at 18–20 (distinguishing those cases from the facts of this case).)

In its reply, Huntington reiterates that "[t]he late fees at issue in this case are clearly 'interest' as that term is defined in 12 C.F.R. § 7.4001(a) and *Smiley*." (ECF No. 144 at 4.) According to Huntington, the state law in issue is preempted because Plaintiffs challenge an interest charge that § 85 allows and the West Virginia law seeks to "regulate national bank fees," which is in conflict with NBA § 85. (*See id.* at 5–7.) Huntington cites OCC interpretive letters to support the notion that it may charge interest at whatever rate is allowed by Ohio, which is Huntington's home state. (*See id.* at 8–9.) Unlike Plaintiffs' argument that they are not challenging the amount of the interest charged, Huntington explains the Plaintiffs' claim as one that disputes Huntington's authority "to increase the 'rate of interest' Plaintiffs owed in September and October 2012 by $30—an amount representing the two $15 late fees Plaintiffs were assessed in those two months after Huntington matched payments made by Plaintiffs to installments due." (*Id.* at 10.)

The Court does not agree that *Smiley*, *Marquette*, or *Vaden*, stands for the broad proposition that Huntington proffers. First, *Smiley* dealt with the specific question of "whether the statutory term 'interest' encompasses late-payment fees." 517 U.S. at 737. The Court did not engage in a preemption analysis because it reviewed "simply the meaning of a provision that does not . . . deal with pre-emption . . . ." *Id.* at 744. The decision does not, as Huntington suggests, indicate that any state law dealing with an interest charge is preempted by § 85, nor did the Court attempt to distinguish between claims that challenge the amount of interest and those that challenge the interest charge itself.

*Marquette* analyzed whether a national bank could use § 85 to charge an interest rate in accordance with the state law where the bank is based when that law allows for a higher rate than that permitted by the state where the bank's nonresident customers live. *See* 439 U.S. at 301. In holding that the bank was allowed by § 85 to charge the higher rate, the court noted that the federal statute "plainly provides that a national bank may charge interest 'on any loan' at the rate allowed by the laws of the state in which the bank is 'located.'" *Id.* at 308. The Court's discussion focused on the residence of the bank and its customers as well as the maximum interest rate each state's law allowed. *See id.* at 308–16. It did not expand its holding beyond affirming a national bank's ability to charge a higher account interest rate than allowed by a foreign state if prescribed by the law of the state where the bank is located. *See id.* at 308.

Lastly, *Vaden* reviewed a district court's finding that a credit card holder's usury claims were completely preempted by Federal Deposit Insurance Act § 27 and that, therefore, a federal question existed for purposes of exercising its jurisdiction. *See* 489 F.3d at 597, 603–04. The Fourth Circuit found that Vaden's claims against Discover Bank "regarding the fees and interest charged on her cardmember account f[e]ll squarely within the [Federal Deposit Insurance

Corporation]'s definition of 'usury' charges." *Id.* at 606–07 (citing 12 C.F.R. § 7.001(a) (defining usury charges)).  The complete preemption analysis did not call into question whether NBA § 85 preempts a state laws attempting to control a national bank's ability to decide which month to apply loan payments when a borrower falls behind on payments.

This Court engaged in a similar discussion on this issue in its memorandum opinion issued September 26, 2014.  (ECF No. 57.)  The opinion determined that "Plaintiffs' claims do not challenge the rate of interest charged by Defendant, but rather challenge Defendant's practice of charging an otherwise non-usurious late fee when no late fee should be charged in the first place." (*Id.* at 11.)  As in the current opinion, the Court did not accept Huntington's argument that *Smiley* stood for "the broad proposition that 'state law claims governing the charging of late fees' are preempted by §§ 85 and 86 of the NBA."  (*Id.* at 10 (quoting ECF No. 7 at 2).)  Section 85, as interpreted by the *Smiley* Court, preempts challenges to the *rate* of "interest" charged, such as the *amount* of a late fee, but the provision and the Supreme Court's interpretation of it do not go so far as to preempt every challenge to the lawfulness of a national bank's late fee assessment, such as those that "do not challenge a late fee as excessive or usurious."  (*See* ECF No. 57 at 10–11 (citing *Smiley*, 517 U.S. at 745–47).)

Huntington also attempts to use the Supreme Court's decision in *Citizens' National Bank of Kansas City v. Donnell*, 195 U.S. 369 (1904), to argue that it may choose to follow Ohio law to determine "how frequently Huntington may assess a late fee when a borrower is delinquent."  (*See* ECF No. 118 at 15.)  However, the *Donnell* case dealt with whether compounding interest on a loan affected the rate of interest when charged as a percentage of the loan, and the Supreme Court decided that it did.  *See* 195 U.S. at 373–74.  The borrower in *Donnell* responded to the bank's suit with a "plea of usury," *see id.* at 374, so the decision is inapposite as far as Huntington attempts to

11

extend that Court's rationale to a situation where the claim does not challenge the fees as excessive or usurious.

Ultimately, § 85 itself does not preempt Plaintiffs' claim that certain late fees charged by Huntington are in violation of West Virginia Code section 46A-3-112(3).  The Court does not find a conflict between the two laws that requires a finding of preemption.  *See, e.g.*, *Hood v. JP Morgan Chase & Co.*, 737 F.3d 78, 93 (5th Cir. 2013) ("[T]here is a difference between alleging that certain customers are being charged too much, and alleging that they should have never been charged for the service in the first place.  The State makes only the latter claim, and . . . it does not appear to challenge Defendants' fees as 'usurious.'").  The mandatory authority that Huntington cites addressing § 85's preemptive effect on state laws focuses on claims that interest rates, including late fees, are usurious in nature.  Courts do not expand the holdings discussed earlier to apply to situations where claims focus on an argument that the fee should not have been charged by the bank in the first instance.  *See, e.g.*, *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1021 (S.D. Iowa 2009) ("[I]t is clear that when Plaintiffs make reference to 'excessive' fees in the Complaint, they are not alleging that the rate of interest charged by Wells Fargo exceeded the interest rate established by statutory law.  If that were Plaintiffs' claim, then it would be a usury claim subject to preemption.  In the instant case, however, Plaintiffs' allegation[s] relate to Wells Fargo's alleged practice of assessing additional 'excessive late fees in the months following the missed payment' . . . As such, Plaintiffs' claims are not usury claims . . . .").  There has been no authority presented that supports a finding to the contrary, and the Court does not characterize Plaintiffs' claims, as Huntington suggests, as claims challenging Huntington's authority "to increase the 'rate of interest' Plaintiffs owed . . . ."  (*See* ECF No. 144 at 10.)  Consistent with this Court's previous memorandum opinion, it cannot conclude now that § 85 preempts section 46A-3-112(3).

### B.  Preemption by the National Bank Act and OCC Regulations

The preemption analysis above was discussed in the context of whether § 85 specifically preempts the state statute at issue.  In finding that it does not, the Court can still engage in the discussion of whether the NBA and OCC regulations preempt Plaintiffs' claims because the decision by Huntington to apply payments to previously missed monthly installments and issue late fees accordingly may be governed generally by federal law.  Even if no single federal law provision poses a direct conflict with the state law in issue, "[a] conflict will also exist where 'the particular state law . . . stands as an obstacle to the accomplishment of federal objectives.'" *Watkins*, 631 F. Supp. 2d at 785–86 (quoting *City of Charleston*, 310 F.3d at 169).

In light of the various NBA provisions and OCC regulations and the case law interpreting them, the Court finds that West Virginia Code section 46A-3-112(3) and Plaintiffs' claims under that provision are preempted because the state law "significantly impair[s] the bank[']s[] exercise of enumerated or incidental powers under the NBA."  *See Barnett Bank*, 517 U.S. at 32–34.  The NBA provides national banks with more sweeping powers to carry out the business of banking than granted by the language set out in § 85.  Whereas § 85 gives banks the power to "charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank is located," 12 U.S.C. § 85, the NBA does not limit banks' authority to actions taken under that explicit power. Upon incorporation, "a national banking association . . . shall have power . . . [t]o exercise by its board of directors or duly authorized officers or agents, subject to law, *all such incidental powers as shall be necessary to carry on the business of banking . . . .*" 12 U.S.C. § 24(Seventh) (emphasis added).  Further, the NBA extends to national banks the authority to engage in the mortgage loan business in accordance with the NBA and its regulations.  For example, "[a]ny national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on

interests in real estate, subject to . . . such restrictions and requirements as the [OCC] may prescribe by regulation or order." *Id.* § 371. Thus, "state law may not significantly burden a national bank's own exercise of its real estate lending power, just as it may not curtail or hinder a national bank's efficient exercise of any other power, incidental or enumerated under the NBA." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 13 (2007) (citations omitted). The Supreme Court noted that this power prevents "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking," which "is precisely what the NBA was designed to prevent." *Id.* at 13–14.

In the absence of explicit preemption language in federal statutes, courts "must consider whether the federal statute's 'structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent.'" *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977); *Fid. Fed. Sav. & Loan Assoc. v. de la Cuesta*, 458 U.S. 141, 152–53 (1982) ("*Fidelity*")) ("*Barnett Bank*"). In *Barnett Bank*, the Supreme Court analyzed the preemptive effect of a federal statute giving national banks certain powers regarding the sale of insurance. That federal statute, 12 U.S.C. § 92, has two similarities to the NBA provisions discussed here. First, that statute "specifically refers to 'rules and regulations' that will govern such sales, while citing as their source not state law, but the federal [OCC]." *Id.* at 32. *Cf.* 12 U.S.C. § 371(a) (providing that national banks' authority to make real estate loans are subject to the "restrictions and requirements" of the OCC). Second, § 92 uses the word "powers" in granting authority to national banks. "In using the word 'powers,'" the Court noted, "the statute chooses a legal concept that, in the context of national bank legislation, has a history. That history is one of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited

by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank*, 517 U.S. 25 at 32 (citations omitted). Thus, the Supreme Court in *Barnett Bank* found that Congress did not intend for the state to "forbid, or to impair significantly," the power given to the banks. *See id.* at 33. "[T]he inquiry under *Barnett Bank* distills to whether the state measure either (1) imposes an obligation on a national bank that is in direct conflict with federal law, or (2) stands as an obstacle to that accomplishment and execution of the full purposes and objectives of Congress." *Cline v. Bank of Am., N.A.*, 823 F. Supp. 2d 387, 397–98 (S.D. W.Va. 2011).

While a presumption against preemption ordinarily applies in an analysis of this type, the Supreme Court has held that this general presumption does not apply in the national banking context. *See Watters*, 550 U.S. at 12; *see also United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."). "When state laws 'significantly impair the exercise of authority, enumerated or incidental under the NBA,' the state laws 'must give way.'" *Monroe Retail, Inc.*, 589 F.3d at 283 (quoting *Watters*, 550 U.S. at 12). The Sixth Circuit has found on several occasions that "the level of 'interference' that gives rise to preemption under the NBA is not very high." *See id.* (citing *Assoc. of Banks in Ins., Inc. v. Duryee*, 270 F.3d 397, 409 (6th Cir. 2001)) (rejecting as "unpersuasive" an "attempt to redefine 'significantly interfere' as 'effectively thwart'"). In finding that "federal law preempts state regulation of the posting order" of debit items presented to a bank for payment against accounts, the Ninth Circuit noted that the "[d]esignation of a posting method falls within the type of overarching federal banking regulatory power that is 'not normally limited by, but rather ordinarily pre-empt[s], contrary state law.'" *Gutierrez*, 704 F.3d at 716, 723 (quoting *Watters*, 550 U.S. at 12 (internal quotation marks

omitted)).  Preemption was a necessary conclusion in *Gutierrez* once the court decided that "[t]he federal court cannot mandate the order in which Wells Fargo posts its transactions."  *Id.* at 725.

Additionally, "[f]ederal regulations have no less pre-emptive effect than federal statutes." *Fidelity*, 458 U.S. at 153.  *See also Lincoln Sav. & Loan Assoc. v. Fed. Home Loan Bank Bd.*, 856 F.2d 1558, 1560 (D.C. Cir. 1988) ("So long as an agency has statutory authority to issue regulations, those regulations will preempt inconsistent state statutes by the simple operation of the Supremacy Clause.").  State laws therefore will be preempted by OCC regulations where "compliance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Ines v. Davidowitz*, 312 U.S. 52, 67 (1941).

"The OCC is the federal agency entrusted with the 'primary responsibility for surveillance of "the business of banking" authorized by § 24 Seventh.'"  *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 311 (2d Cir. 2005) (quoting *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995)).  "It has the power to promulgate rules and regulations and may use its rulemaking authority to define the 'incidental powers' of national banks beyond those specifically enumerated in the statute."  *Id.* (citations omitted).  Ultimately, "it is not necessary for Congress to explicitly state that it intends federal law, including any agency regulations promulgated pursuant to a particular statute, to preempt state law."  *Nat'l City Bank of Ind. v. Turnbaugh*, 367 F. Supp. 2d 805, 817 (D. Md. 2005) (citing *Fidelity*, 458 U.S. at 154), *aff'd*, 463 F.3d 325 (4th Cir. 2006), *cert. denied*, 550 U.S. 913 (2007).  The only question for a court to address when a relevant federal regulation, specifically an OCC regulation, conflicts with state law is "whether [the Comptroller] has exceeded his statutory authority or acted arbitrarily."  *Fidelity*, 458 U.S. at 154

16

(citing *United States v. Shimer*, 367 U.S. 374, 381–82 (1961)).  *See also* 12 U.S.C. § 25b(5) ("A Court reviewing any determinations made by the Comptroller . . . shall assess the validity of such determinations, depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision.").

A regulation's preemptive effect may be determined by a plain reading of the regulatory language itself.  *See Barnett Bank*, 517 U.S. at 37.  In *Barnett Bank*, "the Comptroller's . . . interpretation of the Federal Statute [did] not suggest that the statute provides only a limited authority subject to similar state approval."  *Id.*  Thus, the regulations prompted a finding in that case that federal law preempted the state law at issue.  *See id.*  Other federal courts also have discussed the preemption of state laws by OCC regulations.  The Ninth Circuit cited OCC regulations that delegate to banks the power to set account terms and calculate fees in order to justify the preemption of a state law seeking to dictate a national bank's internal method for posting debit transactions.  *See Gutierrez*, 704 F.3d at 723–25.  "The OCC has interpreted these incidental powers [from the NBA] to include the power to set account terms . . . In sum, federal law authorizes national banks to establish a posting order as part and parcel of setting fees, which is a pricing decision."  *Id.* at 724 (citing 12 C.F.R. § 7.4002 (giving national banks the authority to impose certain charges and fees)).  Thus, the court in *Gutierrez* concluded:

> Wells Fargo's decision to resequence the posting order falls within the OCC's definition of a pricing decision authorized by federal law.  The district court is not free to disregard the OCC's determinations of what constitutes a legitimate pricing decision, nor can it apply state law in a way that interferes with this enumerated and incidental power of national banks.

*Id.* at 725.

Similarly, the Sixth Circuit reiterated in *Monroe Retail, Inc.* that courts should give substantial deference to the OCC's interpretation of the NBA. *See* 589 F.3d at 280. Its rationale came from Supreme Court jurisprudence:

> It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The [OCC] is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to [its] deliberative conclusions as to the meaning of these laws.

*Id.* (quoting *Clarke v. Secs. Indus. Assoc.*, 479 U.S. 388, 403–04 (1987) (internal citations omitted)). The majority in *Monroe Retail, Inc.* found that the NBA preempted an Ohio law, in part, because "[t]he OCC has specifically defined the ability to charge fees as an 'incidental power' of a national bank." *See id.* at 280–81; *see also* 12 C.F.R. § 7.4001(b) ("The national bank may . . . charge late fees to its interstate customers because the fees are interest under the Federal definition of interest and an allowable charge under state law where the national bank is located.") These cases demonstrate that courts should give OCC regulations substantial deference and that the Comptroller's interpretation of various NBA provisions may trigger preemption.

Huntington argues in its memorandum in support of its motion that even if West Virginia Code section 46A-3-112(3) is not preempted by § 85 because it does not explicitly regulate interest rates, it is still preempted by "other provisions of the [NBA]" and OCC regulations because the NBA enjoys "a preemptive force that other federal laws do not enjoy." (*See* ECF No. 118 at 17.) Thus, Huntington notes, state laws that "'prevent or significantly interfere with [a] national bank's exercise' of its federal banking authority" are preempted. (*Id.* at 18 (quoting *Barnett Bank*, 517 U.S. at 33).) Huntington claims that section 46A-3-112(3) is unlawful in this regard because the NBA gives Huntington "broad authority to originate and service mortgage loans," (*see id.* at 18–19), and that the WVCCPA provision "prevents Huntington from exercising its federal right to

service mortgage loans." (*See id.* at 19–22.)  In support of this argument, Huntington cites a California state appellate court case and two federal circuit court decisions outside of the Fourth Circuit in addition to an OCC regulation.  (*Id.* (citing *Gutierrez*, 704 F.3d at 712; *Monroe Retail, Inc.*, 589 F.3d at 274; *Akopyan v. Wells Fargo Home Mortg.*, 155 Cal. Rptr. 3d 245 (Cal. Ct. App. 2013); 12 C.F.R. § 34.4).)

Plaintiffs argue that the WVCCPA provision here "does not prevent or significantly interfere with the power at issue—Huntington's power to make real estate loans . . .—or with any incidental power 'necessary to carry on the business of banking.'"  (*See* ECF No. 139 at 21 (citations omitted).)  Plaintiffs assert that accepting Huntington's argument requires buying into the assumption that "any state law that prevented a bank from doing anything it was otherwise allowed to do would be preempted."  (*See id.*)  They argue that the Fourth Circuit has foreclosed this argument by ruling that state laws regulating an area "related to a bank's powers" are not automatically considered to interfere with those powers.  (*See id.* at 21–22 (citing *Decohen v. Capital One, N.A.*, 703 F.3d 216, 224–25 (4th Cir. 2012); *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 323 (4th Cir. 2012)).)  Plaintiffs allege further that the WVCCPA provision does not "significantly interfere with Huntington's ability to make mortgage loans" because Huntington has the software capability to modify loan servicing instructions, and that the bank has not demonstrated that compliance with the state law here would cost the bank or affect its efficiency to such an extent.  (*See id.* at 24–25.)

In reply, Huntington specifically cites NBA §§ 24(Seventh), 371, and an OCC regulation promulgated at 12 C.F.R. § 34.4(a) as authority that preempts the enforcement of West Virginia Code section 46A-3-112(3).  (*See* ECF No. 144 at 12–14.)  Huntington argues that various judicial decisions confirm these provisions' preemptive effect and dispute the authority cited by Plaintiffs

in their response to the motion.  (*See id.* at 14 (citing *Gutierrez*, 704 F.3d at 723–25; *Monroe Retail, Inc.*, 589 F.3d at 283; *Turnbaugh*, 463 F.3d at 332–33; *Akopyan*, 155 Cal. Rptr. 3d at 245, 272).) Lastly, Huntington argues in contrast to Plaintiffs that simply because "'a national bank *can* act consistently with both state and federal law in a particular area does not preclude the possibility that state law' may be preempted by the [NBA]."  (*See id.* at 17–19 (quoting *Lusnak v. Bank of Am., N.A.*, No. CV 14-1855-GHK (AJWx), 2014 WL 6779131, at *5 n.9 (C.D. Cal. Oct. 29, 2014)).)

As a national bank, Huntington is afforded "all such incidental powers as shall be necessary to carry on the business of banking."  *See* 12 U.S.C. § 24(Seventh).  The "business of banking" as provided for in § 24(Seventh) "is not limited to the power enumerated" in that section.  *See NationsBank v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2 (1995).  Therefore, the OCC "may authorize additional activities if encompassed by a reasonable interpretation of § 24 (Seventh)."  *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 640 (D.C. Cir. 2000).  The OCC has extended the business of banking to include the making of real estate loans, *see id.* § 371(a), and in its interpretation of the NBA, the OCC issued a regulation, following the necessary notice and comment period, that gives national banks like Huntington the ability to make real estate loans under § 371 "without regard to state law limitations concerning . . . [t]he terms of credit, including schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments," and the servicing of those mortgages.  12 C.F.R. § 34.4(a)(4), (10).

The OCC confirmed in the proposed final rule that "the specific types of laws cited in [section 34.4(a)] are consistent with the standard for conflict preemption in the Supreme Court's *Barnett* decision."  *See* Office of Thrift Supervision Integration; Dodd-Frank Act Implementation,

76 Fed. Reg. 43,557 (July 21, 2011) (to be codified at 12 C.F.R. pt. 34).  Like the OCC regulation

discussed in *Barnett Bank*, the Comptroller's interpretation of the powers set forth in § 371, such

as scheduling payments and servicing mortgages, does not indicate that the "statute provides only

a limited authority subject to similar state approval."  *See* 517 U.S. at 37; *see also* 12 C.F.R. §

34.4.  Thus, the language of the regulation leaves no role for states to legislate in the area of

servicing mortgages or scheduling payments due.  *See, e.g.*, *Conrad v. Wells Fargo Bank, NA*, No.

3:08–0829, 2009 WL 36478, at *3 (S.D. W.Va. Jan. 5, 2009) (memorandum opinion) (preempting

the plaintiff's claim and noting that title twelve, section 34.4(a) of the Code of Federal Regulations

provides that state laws regulating amortization schedules do not apply to national banks).

     To require Huntington to abide by different states' laws regarding how it must post

payments but allowing it otherwise to service mortgages and schedule payments uniformly across

the fifty states is inconsistent with the NBA and OCC regulations.[3]  The Court finds persuasive

the rationale from *Akopyan* and *Gutierrez* cited by Huntington.  The *Akopyan* Court found that a

state-imposed payment application standard that became an implied term of borrowers' loans

significantly impaired the national bank's servicing powers based on the following:

> It . . . requires Wells Fargo to operate under diverse payment application schemes
> for loans it services in California and other states despite the uniform payment
> application terms of the mortgages it services.  This is inconsistent with the purpose
> of the NBA to prevent the states from imposing 'diverse and duplicative . . .
> limitations and restrictions' on its power to engage in the business of banking.

155 Cal. Rptr. at 272 (citation omitted).  Furthermore, the court in *Gutierrez* reasoned that "[t]he

ability to choose a method of posting transactions is not only a useful, but also a *necessary*,

component of a posting process that is integrally related to the receipt of deposits."  704 F.3d at

---

[3] In her deposition, Huntington's corporate representative on compliance, Connie McKee, testified that she was unaware of any state law other than the West Virginia law at issue here that "require[s] Huntington Bank to assess or collect late fees differently than Ohio law does."  (*See* ECF 139-1 at 4 (99:6–22).)

723 (noting that this power is one contained within "the type of overarching federal banking regulatory power that is 'not normally limited by, but rather ordinarily pre-empt[s], contrary state law'" (citing *Watters*, 550 U.S. at 12 (internal quotation marks omitted))) (emphasis added).  Like the receipt of deposits, the receipt of payments for mortgage loans, a power also regulated solely under federal banking law, includes as an essential component the "ability to choose a method of posting" these payments.  *See id.*

With regard to late fees, the OCC has explicitly interpreted the NBA to allow the charge of late fees regardless of incompatible state law.  *See Wittenberg v. First Indep. Mortg. Co.*, No. 3:10–CV–58, 2011 WL 1357483, at *14 (N.D. W.Va. Apr. 11, 2001) (finding that the plaintiff's WVCCPA claim related to the delinquency of her loan payments was expressly preempted by Code of Federal Regulations, title twelve, section 34.4(a)(10), because the claim "implicate[d] the 'processing' and 'servicing' of mortgages by a national bank"); *cf. Augustin v. PNC Fin. Servs. Grp., Inc.* 707 F. Supp. 2d 1080, 1095 (D. Haw. 2010) (citing *Miller v. Bank of Am., N.A. (U.S.A.)*, 88 Cal. Rptr. 3d 723, 725, 728 (Cal. Ct. App. 2009) ("[A] California law that prohibited banks from charging late fees for credit card payments posted on the first day after a bank holiday, when a fee would not have been charged if payment had been posted on the holiday . . . was preempted, as its focus on payment due dates was directly in conflict with the OCC regulations providing that a bank can make loans without regard to state law regulating terms of credit, including the 'schedule for repayment' and 'payments due.'")).  The OCC has enumerated only certain areas of law within which a state may regulate banks' real estate lending powers.  *See* 12 C.F.R. § 34.4(b) ("State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent consistent with . . . *Barnett Bank* . . . (1) Contracts; (2) Torts; (3) Criminal law; (4) Homestead laws . . . ; (5) Rights to collect debts; (6)

Acquisition and transfer of real property; (7) Taxation; (8) Zoning; and (9) Any other law that the OCC determines to be applicable to national banks in accordance with the decision of the Supreme Court in *Barnett Bank . . . .*").

The West Virginia provision at issue here attempts to regulate Huntington's ability to apply payments and charge late fees as part of servicing the mortgage loan it extended to Plaintiffs. If enforced, Huntington would not be able to apply a borrower's loan payment to a previous month despite the possibility that a previous month's installment may not have been paid. Thus, while Huntington may charge the borrower a one-time late fee on a missed payment, it would not have the ability to use a current payment to satisfy that missed installment, nor would it be able to charge any additional delinquency fee. For example, if a borrower chooses not to pay the January 2017 installment on a loan but proceeds to make a payment in February 2017 without making a catch-up payment and without indicating that the payment is intended for the February installment, the bank must still apply the current payment to the February installment, leave the January installment unfulfilled, and refrain from charging any type of delinquency or late fee. This is all in light of a national bank's ability to make, process, and service real estate loans and schedule payments for those loans. *See* 12 C.F.R. § 34.4.

The application of loan payments to particular monthly installments is not explicitly covered in the OCC's regulation beyond giving national banks the general ability to schedule payments and service mortgages; however, the Court can analogize it to a national bank's explicit power to choose where and how to apply payments in other circumstances. For instance, a national bank has the explicit power to decide what proportion of each monthly payment is applied both to principal and interest. The OCC regulation defining a national bank's power to make real estate loans under 12 U.S.C. §§ 34.3, 371 includes the specific caveat that a national bank may do so

"without regard to state law limitations concerning . . . [t]he terms of credit, including . . . amortization of loans . . . ." 12 C.F.R. § 34.4(a)(4). Amortization involves the creation of a schedule to gradually eliminate the mortgage through payments that properly cover both the loan's principal and interest. *See* Office of the Comptroller of the Currency, Comptroller's Handbook: Commercial Real Estate Lending 39–41 (2013). National banks like Huntington, therefore, have a right to define the terms of credit and apply installment payments it receives from borrowers proportionally to principal and interest to ensure that the mortgage loan is paid off according to the bank's terms. Similarly, by creating a schedule for repayment and servicing the mortgage, the bank obtains the incidental power to apply loan payments to a previous month to guarantee that the mortgage is eliminated consistent with the bank's terms. A state law regulating how Huntington must apply monthly payments significantly interferes with the enumerated and incidental power provided to the bank by the NBA and OCC regulations. *Cf. Gutierrez*, 704 F.3d at 724–25.

The NBA and OCC regulations preempt Plaintiffs' claims because they are brought under the type of state law that Congress, by virtue of the OCC's interpretations of the NBA, intended to preempt. If Plaintiffs' claims were brought under general contract or tort law, for example, then the Court would struggle to find that preemption exists. *See, e.g.*, *Watters*, 550 U.S. at 12; *see also* 12 C.F.R. § 34.4(b)(1), (2). The West Virginia statute as it applies in this case, though, cannot survive in light of federal law. The NBA and OCC regulations give Huntington the right to make real estate loans, charge interest rates on those loans, and service those loans in compliance with federal law. These powers are not to be limited by state law. *Cf. Bishop v. Ocwen Loan Servicing, LLC*, No. 3:10–0468, 2010 WL 4115463, at *8 (S.D. W.Va. Oct. 19, 2010) (dismissing a plaintiff's claim that charged the defendant "with routinely assessing late fees in violation of [West Virginia

Code] § 46A-3-112" on preemption grounds because the claim "represent[ed] an attempt to regulate '[l]oan-related fees, including . . . initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees" (quoting 12 C.F.R. § 560.2(b)(5)). The decision to apply a borrower's payment to a previous month when that borrower failed to pay the prior month's installment payment is an aspect of loan servicing that Huntington has a prerogative to control as allowed by federal law. While Plaintiffs argue that this finding supports the proposition that "any state law that prevented a bank from doing anything it was otherwise allowed to do would be preempted,"[4] (*see* ECF No. 139 at 21), the state law here is preempted not because it keeps Huntington from doing something it would otherwise be allowed to do, but rather because federal law provides Huntington the power to do it without limitation by state law.

As provided above, the Court "must defer to the OCC's authorized and reasonable implementation of the NBA." *See Burke*, 414 F.3d at 321. In resolving this question of law, the Court has determined that the OCC has interpreted the NBA as giving a national bank the power

---

[4] The cases Plaintiffs cite in support of this proposition are inapposite to the current facts. *Decohen v. Capital One, N.A.* analyzed whether the Maryland Credit Grantor Closed End Provisions ("CLEC"), which regulate debt cancellation agreements, were preempted by federal banking regulations. *See* 703 F.3d 216, 224–25 (4th Cir. 2012). The case was brought against a national bank, which triggers the relevance of federal regulations; however, the national bank did not loan the plaintiff the money at issue. *See id.* Rather, the loan was assigned to Capital Bank from a local car dealer. *See id.* at 225. Therefore, the claim was not preempted by federal regulations:

> This case concerns a loan entered into by Nation Auto, a local car dealer, and assigned to Capital One. As Nation Auto is not a national bank, there is no question that a [retail sales installment contract] signed by Nation Auto that contains a clause electing to be governed by the CLEC is in fact governed by the CLEC. Because Capital One did not "enter into" or "offer" any debt cancellation agreements to Decohen, the regulations dealing with such conduct are inapposite.

*Id.*

Further, Plaintiffs cite *Epps v. JP Morgan Chase Bank, N.A.*, which also analyzes Maryland's CLEC. *See* 675 F.3d 315, 320–23 (4th Cir. 2012). The Fourth Circuit held in *Epps* that certain repossession provisions in a retail sales installment contract, required by the CLEC, were not preempted by the NBA and OCC regulations because the relevant debt collection notices upon default "[were] not 'disclosures' within the meaning of the NBA and OCC regulations." *See id.* at 324–25. Like the contract in *Decohen*, the binding document in *Epps* expressly stated that it was governed by the CLEC and was thus enforceable against the lender's successor once the loan was assigned to a national bank. *Compare id.*, *with Decohen*, 703 F.3d at 225. Neither of these cases dealt with mortgage loans, a national bank as the primary lender, or the WVCCPA, so the Court finds that they are easily distinguished from the facts of the present action.

to service mortgages and schedule payments as it sees fit.  Based on other OCC interpretations that courts have deemed valid and the relevant and persuasive factors discussed, the Court concludes that the OCC did not exceed its statutory authority or act arbitrarily in making determinations regarding a national bank's ability to service mortgages and schedule loan payments.  *See Fidelity*, 458 U.S. at 154.  Thus, a state law, like section 46A-3-112, cannot survive when it is in conflict with a national bank's powers provided to it by federal law.  In the words of Justice Jackson, "[w]e cannot resolve conflicts of authority by our judgment as to the wisdom or need of either conflicting policy.  The compact between the states creating the Federal Government resolves them as a matter of supremacy."  *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 378–79 (1954).  Thus, as a matter of supremacy, the NBA, read together with the OCC regulations discussed above, preempts West Virginia's exercise of regulatory authority over Huntington's ability to apply payments and charge late fees as it sees fit.  Summary judgment is appropriate in this case.  *See Taft*, 70 F.3d at 316.

## IV.  CONCLUSION

For the reasons stated above, Huntington's Motion for Summary Judgment, (ECF No. 117), is **GRANTED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          December 28, 2016

_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE